UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 10-CR-48 |
| v. | : | |
| | : | (J. Jambo) |
| JOANNE M. SEELEY | : | |
| Defendant | : | FILED |
| | | HARRISBURG, PA |
| | | FEB 23 2010 |
| INFORMATION | | MARY E. D'ANDREA, CLERK |
| | | Per _____ |

The U.S. Attorney Charges:

### COUNT 1 - WIRE FRAUD
18 U.S.C. §1343

**I.   BACKGROUND**

1. At all times pertinent to this Information the defendant, Joann M. Seeley was the primary owner and operator of a York County based real estate business known as S &D Property Solutions (S&D) in East Berlin, PA.

2. Seeley was a Pennsylvania licensed real estate agent until November 9, 2006, when she agreed to permanently surrender her license in lieu of disciplinary action.

## II.   THE SCHEME TO DEFRAUD

3. Between January of 2006 and December of 2008, in the Middle District of PA and elsewhere, the defendant,

### JOANN M. SEELEY

did devise a scheme and artifice to defraud, and for obtaining money and property, by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing said scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writing, sign, signal, picture, or sound for the purpose of executing such scheme or artifice, to wit; in that Seeley devised and perpetrated a scheme to defraud at least 10 mortgage lenders and 5 individual investors out of approximately $2.2 million through the use of false promises, false real estate purchase contracts, inflated real estate appraisals, and fictional real estate leases.

## III.   MANNER AND MEANS

4. It was a manner and means of the scheme to defraud that Seeley would identify a residence scheduled for Sheriff's Sale.  Seeley would approach the homeowner and tell him he could avoid foreclosure by selling the home to her or one of her investor/buyers, who would then lease the property back to the

homeowner after the sale. Seeley told the homeowner the sale would allow him to pay off personal debts, rebuild his credit rating, and allow him to qualify for a new mortgage when he bought back his home, usually within one or two years later.

5. In order to induce their purchase of the homeowner's residence, investor/buyers were told by Seeley they would be reimbursed for all out-of-pocket expenses, including their down payment, at the time of closing and they would receive a "fee" for engaging in the transaction. Seeley also promised the investor/buyers the homeowner would pay them a monthly rent that would cover most, if not all, of their mortgage payments. Some investors were also promised an up front, lump sum rent subsidy payment at the time of closing in order to make up the difference between their mortgage payment and the rent they received. The investor/buyers were also promised that if the seller/homeowner defaulted on their agreement to buy back the home, the residence would be sold and the investor would receive 50% of the equity from the sale.

6. In order for the scheme to work Seeley had to obtain inflated appraisals for the residences. Dealing with a select group of local appraisers, Seeley would provide the appraisers specific comparable sales data to support the inflated prices for the homes. If one appraiser would not come up with the numbers Seeley needed, she would "shop" for another until the necessary value was obtained.

7. It was also part of Seeley's scheme to defraud that she would submit false documents to the lenders in order to induce them into approving the mortgage loans. Seeley would submit edited or incomplete sales contracts which failed to disclose material terms and/or addendums, including the fact the buyer and seller had entered into Installment Sales Contracts for the buy-back of the property. Seeley also concealed the fact the down payment and other out of pocket expenses were refunded to the investor/buyers from the sales proceeds. Seeley also submitted fraudulent leases to the lenders which listed fictitious names for the tenants and inflated rental payments. As a result, Seeley induced 10 mortgage lenders into making 29 mortgage loans that resulted in losses totaling $1,970,972.

8. Seeley converted a significant portion of the falsely obtained financing to her own use in two different ways. When Seeley would purchase the property in her name or the name of a family member,[1] she would charge a grossly inflated commission on the sale, with the fee ranging anywhere between 17% and 45%. When Seeley employed a 3rd party investor to purchase the property, she would simply have the homeowner endorse his sales proceeds check from the closing over to Seeley and/or S&D.

---

[1] Seeley was listed as the borrower on 6 fraudulent mortgage applications.

9. In late 2008, as Seeley's scheme began to fall apart, Seeley modified her tactics in order to generate additional funds. Seeley offered one investor an opportunity to purchase a real estate "franchise" in exchange for $75,000. However, Seeley employed this money to avoid the foreclosure of her personal residence. Seeley also told other investors that in order to participate in her "Loan Expansion Program," they would have to pre-pay $50,000 in order to earn a high rate of return. As a result, Seeley obtained another $178,000 from 4 other individuals. However, none of the investors ever received any return on their investments as promised by Seeley.

## IV. THE WIRE TRANSFER

10. On or about November 30, 2007, in furtherance of her scheme and artifice to defraud, Seeley did knowing cause the sum of $145,854 to be sent by wire transfer from CitiMortgage in New York, NY to the Commerce Bank, State College, PA.

**All in violation of Title 18, United States Code, Section 1343.**

DENNIS C. PFANNENSCHMIDT
United States Attorney
Middle District of PA

Date: 2-22-10